## DOUGLAS v. PETTIT

(March 4, 1929. Opinion and Decree.)
(April 1, 1929. Rehearing Refused.)
(May 21, 1929. Writ of Certiorari and Review Refused by Supreme Court. )

Paul W. Maloney, of New Orleans, attorney for plaintiff, appellee.

Andrew M. Buchmann and Henry W. Robinson, of New Orleans, attorneys for defendant, appellant.

JONES, J. Plaintiff sues for $25,000 damages for amputation of her left arm, consequent upon blood poisoning alleged to have been caused by the cutting of her left arm in three places, when an upper window sash slipped from her hand and bounded upward with such violence that the glass was broken. She alleges that the defendant, owner of the house, although notified of the dangerous condition of the sash, "due both to the weights of the window being out of line and the fact that there was no putty or other protection to the glass," failed to see that repairs were made.

Defendant denied alleged negligence and averred as follows:

(1) Plaintiff's injuries were caused by her carelessness in slamming the sash with great force and striking the glass violently with her arm.

(2) That the house was in good condition at the time it was leased to William Gorman, plaintiff's uncle and adopted

father, and so remained during the entire lease; that the property had recently been examined by a competent carpenter, and the windows and weights were apparently in good condition at the time the plaintiff received her injuries.

Subsequently defendant filed an exception of no cause or right of action and prayed that the suit be dismissed.

The case was tried without a jury, and the court rendered judgment in favor of the plaintiff for $2,000.

Defendant appealed, and plaintiff has answered the appeal and asked for an increase.

The evidence shows that plaintiff, a woman of 31 years of age and 5 feet 5 inches in height, had been living with her stepfather and uncle, William Gorman, on the premises for a great many years, and had been living in the front room, in which this accident happened, for three years prior to the accident, during which time she had lowered this sash at least 60 times without noticing that anything was wrong. The building was an old one and was so constructed that the two windows fronting on the gallery could be used as doors when both sashes were raised, and there was an opening of 10 inches between the upper and lower sashes when the lower sash was down and the upper sash was raised as far as possible. On the afternoon of August 17, 1927, about 4:30, during a violent rainstorm, plaintiff was pulling the upper sash down, and, before she had fastened the catch to hold it so that its bottom part should be even with the upper part of the lower sash, she says it slipped from her hand and bounded up with such violence that the pane, which consisted of one solid piece of glass, was broken by the impact, and when she heard the consequent noise she stepped back and threw up her left arm to protect her face, but in spite of her precautions her left arm was badly cut in three places—one on the outside of the arm about two inches above the elbow, another on the inside of the arm just over the center of the biceps, and the third on the outside of the arm about half the distance between the wrist and the elbow. She was taken immediately to the Mercy Hospital in this city, where her injured arm was bandaged by Dr. Leckert, who describes her injuries as follows:

"She had three, a very large one on the back, posterior part, of the upper arm, I should judge about 4½ or 5 inches in length; a smaller one about an inch; and a third one, where the glass went in, in the region of the outer part of the elbow."

A piece of glass 4½ inches in length was extracted from her arm about a week after the injury; it had been covered by muscle and was deep down in the forearm. This was not discovered at the time of the injury. It was only on packing the wound that it was discovered and taken out.

She developed gangrene of the hand, and amputation resulted.

Gorman, the stepfather of plaintiff and tenant of the house, testified that he could recall no complaint to the defendant about this particular window, and in this he was confirmed by his wife, Mrs. Gorman.

Andrew Williams, the carpenter who took the weights out of the window, testified that one weighed 15 pounds and the other 16; that he had put brads and a new sash cord in the window in the fall of 1926, but had not used putty because the owner said "it would take too much"; that the brads held the glass sufficiently tight while he was working, and that neither Mrs. Douglas nor Mrs. Gorman, when they

saw him working on the window, had said anything about the weights.

Cassanova, a contractor, testified that, although he regarded a difference of one pound in the weights as serious, if the window had been used for 25 years without any complaint on this point he would say that it was pretty good for the purpose.

Burns, a witness for the defendant and a general contractor for the past 35 years specializing in frame buildings, testified that the sash which was produced in court weighed 10 pounds, and that the glass, a part of which was also produced in court, weighed 19½ pounds, and that it would require about a pound and a half of putty, which would make the total weight of the upper sash 31 pounds exactly, equal to that of the weights; that a difference in weight of one pound under the circumstances would not make any difference; that the glass is held in the sash by glazier's points and that putty is used to keep the rain and wind out; that he had examined the sash and found three glazier's points on each side and two at the bottom. He could not tell about the top because the putty was still in place there. His testimony further shows that it would take "an awful slam" to break the glass. The frame was then produced in court, and it was admitted by counsel that the sash showed that there were three points on the bottom, four on the right, four on the left, and four on the top, and that they were all glazier's points and there were no brads. It was likewise agreed that the sash showed the following putty remaining: On the right side, 6 inches of putty, 3 inches from the top, none for 8 inches, then putty for 2 inches, none for 8¼ inches, then one inch of putty; none to the bottom. On the bottom there was only 2 inches of putty. On the left side none 4 inches from the top; then 24 inches of putty; then none to the bottom; on the top solid putty all the way across. Practically all the space bare of putty on the right side is clean and new, showing recent removal of putty, apparently. Where the putty is missing on the right side the exposed part of the frame is not weather-beaten, and the bottom appeared to be slightly weather-beaten.

On cross-examination Burns repeated that a difference of 1½ or 2 pounds under the circumstances, between the weights, would have a tendency to make the window pull and stop, but it would not take much to start it again; that it would take a very severe blow to break a glass of the thickness shown in the pieces offered.

Scahill, a brother of defendant and her local agent, testified that no complaint had ever been made to him about this window, and in September, 1926, Gorman had said that some of the windows needed new cords and asked to have them repaired, and he had hired Williams to do this; that Williams did not say anything about putty to him, as he had instructed Williams to overlook the building and put in good repair, Williams had worked there four or five days and had been paid $17; that he and his sister's family had lived in the property for 16 years, after which possession was taken by the Gormans, who had occupied the property ever since, and during the entire time had made no complaint about this window; that after repairs were made by Williams he had visited the property and was told by Mrs. Gorman that she was well pleased with the work the carpenter had done.

Defendant argues here that its exception of no cause of action should be sustained.

In Harris vs. Tennis, 149 La. 295, 88 So. 912, the court said:

"Plaintiff alleges that, owing to the rottenness of the window frame of the house leased by defendant to her husband, in which they lived, the appliance for holding up the sash gave way, that the sash fell upon her hand and crushed it, and she sues the defendant lessor in damages. She founds her action upon the following article of the Civil Code:

"'Art. 2717. The expenses of the repairs, which unforeseen events or decay may render necessary, must be supported by the lessor, though such repairs be of the nature of those which are usually done by the lessee.'

"But the case falls under article 2716, which reads:

"'The repairs, which must be made at the expense of the tenant, are those, which during the lease, it becomes necessary to make: * * *

"'To windows, shutters, partitions, shop windows, locks and hinges, and everything of that kind, according to the custom of the place.'

"Inasmuch as the person in default for failure to make the repair was plaintiff's husband, she cannot recover of defendant. The trial court so held.

"Judgment affirmed, at appellant's cost."

The dissenting opinion of Judge Monroe in this case went thoroughly into the distinction between repairs due to decay and other repairs, with which the majority disagreed, showing that distinction was well-considered and overborne.

Although the above analysis of the evidence in this case seems to bring it within the purview of the doctrine laid down by the Supreme Court in the decision just quoted, and therefore to make the exception of no cause of action urged by the defendant of very great force, we prefer to pass over that point and decide the matter once for all on the merits.

In the case of Brodtman vs. Finerty, 116 La. 1104, 41 So. 329, the Supreme Court said:

"The head of the family represents the family. If he, a tenant, is without a right of action because of his failure to make the repairs, although he had the right to make them, the members of the family occupying the dwelling are equally as concluded."

Plaintiff has entirely failed to prove any faulty construction in the window. On the contrary, the evidence which she offered as to the difference in the weights would seem to show that this slight difference would tend to retard the motion of the upper sash rather than accelerate it. The fact that she had occupied the room for so many years, and that her adopted father and mother had lived there without complaint for a long time, confirms our conclusion as to the correct construction of the window. Furthermore, we are at a loss to understand how the cuts in plaintiff's arms could have been caused by the falling glass if she was holding her arm over her eyes as she testifies.

For above reasons, the judgment is reversed and the suit of plaintiff is dismissed, at her cost.